1

2

3

4

5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

6

7

8

9

10

| | |
|---|---|
| KANT MUCHHALA, et al., | 1:05-CV-0863 OWW |
| Plaintiffs, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

11

12

**I.   INTRODUCTION**

13   On May 9, 2004, Jay David Muchhala, a twenty-seven year old

14 man, climbed a high voltage power pole in Yosemite National Park

15 ("Yosemite").  He was electrocuted and died, either as a result

16 of the electrocution or from the resulting fall.  Plaintiffs, Jay

17 Muchhala's parents, filed suit against the United States of

18 America, which owns and operates the Park as well as the high

19 voltage electric pole at which the accident occurred.  Brought

20 under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., the

21 complaint alleges (1) negligence and (2) dangerous condition of

22 public property.  (Doc. 1, June 30, 2005.)

23   On August 4, 2006, Magistrate Judge Lawrence J. O'Neill

24 granted the United States' motion for summary judgment with

25 respect to the issue of negligence per se, but denied the motion

26 as to all other issues.  (Doc. 36.)  Evidence was taken during a

27 three day bench trial on September 21-23, 2006.  (Docs. 69-71.)

28 The parties presented oral summations at the close of evidence.

**1**

The parties were also invited to submit proposed findings of fact and conclusions of law, and did so.  (Docs. 73, 74.)  Having considered all submissions and the arguments of the parties, the following findings of fact and conclusions of law are entered.

## II.  FINDINGS OF FACT

**A.   Overview of the Accident**.

1.   On May 9, 2004, Jay David Muchhala climbed a 30-foot, galvanized steel utility pole (the "accident pole") adjacent to the Four Mile Trail in Yosemite National Park ("Yosemite"). (Agreed Statement of Facts ("ASF") #3 (Joint Exhibit ("JE") 13.))

2.   Jay Muchhala paid admission and was lawfully on the premises of Yosemite. (ASF #1.)

3.   While climbing the accident pole, Jay Muchhala was electrocuted and died, either as a result of the electrocution, or from the fall from the pole.  (Coroner's Report, Plaintiffs' Exhibit ("PE") 180.)  Jay Muchhala's head wounds were "also lethal in extent."  (*Id.*)

4.   Shortly before the accident, Jay Muchhala wrote in his journal "[c]limbed two electricity towers and am just below the third."  (Journal Entry, PE 176.)

5.   Mr. Muchhala was 27 years old at the time of the accident.  (ASF #7.)

**B.   The Accident Pole and the Glacier Point Line**.

6.   The accident pole is one of ten steel poles that form a high voltage electrical distribution line within Yosemite, referred to as the Glacier Point Line.  (ASF #2.)

7.   The Glacier Point Line is one of four high voltage power lines operated and maintained by Defendant United States of America within Yosemite.  (ASF #2; Testimony of Kent Summers.)

8.   Witnesses testified that the accident pole is located anywhere from 20 to 200 feet from the Four Mile trail. (Testimony of Kent Summers (100-200 feet), Keith Guy (20 feet), Deposition Testimony of Susan Whittier (25-30 feet).)

9.   To access the accident pole from the trail, one must scramble down some boulders in a boulder field.  (Testimony of Keith Guy, Kent Summers.)

10.   The trail is visible from the base of the pole. (Testimony of Keith Guy.)  However, the lines and pole are not particularly noticeable from the trail.  Stephen Whittier, a witness to part of the accident, did not notice the power line until he and his family heard a snapping noise and saw Jay Muchhala fall from the pole.  (Deposition Testimony of Stephen Whittier.)  Susan Whittier, who also witnessed the accident, noticed the power lines on her way up the trail, but didn't take particular note of them until the accident.  (*Id.*)

11.   The accident pole is 30 feet tall and made of galvanized steel.  The accident pole has two cross arms close to the top.  The lower cross arm, which was not in use at the time of the accident, may have previously been used to carry communication wires.  Located approximately four feet above the lower cross arm was the upper cross arm, on which run four lines, three conductor lines that each carry 12,000 volt current and a "static line."  (Testimony of Kent Summers.)

**3**

1    12.  As each conductor line approaches the pole, it meets

2  insulators, one on each side of the pole, which keep the electric

3  current from being conducted through the pole to the ground.  A

4  "jumper cable" or "jumper" bypasses the insulators, carrying

5  electricity from the outside of the insulator on one side of the

6  pole to the outside of the insulator on the other side of the

7  pole.  (Testimony of Kent Summers.)

8    13.  Nine of the ten poles in the Glacier Point Line are

9  substantially identical to the accident pole.  The remaining pole

10  ("Pole #1"), which is located at the bottom of the valley,

11  differs in construction.  It is a "riser" pole, where the high

12  voltage power line is transferred from below ground to above

13  ground.  (Testimony of Kent Summers.)

14    14.  There were no warning signs on the accident pole at the

15  time of the accident.  (ASF #4.)  Nor was there physical evidence

16  indicating a sign had previously been located on the pole.

17  (Testimony of Kent Summers, Steven Yu.)

18    15.  At the time of the accident, a number of other poles on

19  the Glacier Point Line also did not have high voltage warning

20  signs.  (Testimony of Kent Summers, Robert Armstrong.)

21    16.  The riser pole had high voltage markings on the top

22  cross arm on the date of the incident.  (JE. 8 & 9; Testimony of

23  Kent Summers & Paul Laymon.)  After the accident, a yellow high

24  voltage warning sticker was also placed near the base of the

25  riser pole.  Two years later, in 2006, a picture taken of that

26  sticker reveals that the yellow warning sticker had begun to peel

27  off the pole.  (Testimony of Kent Summers.)

28

**4**

17.   All of the poles on the Glacier Point Line have removable steel pegs.  (Testimony of Kent Summers.)  The removable pegs attach to the pole by screwing or bolting into steel flanges.  These flanges are also known as "saddles." (Testimony of Kent Summers.)

18.   At the time of the accident, the lowest climbing peg on the accident pole was located approximately four feet above ground level.  Three additional pegs were located lower than 7'6" feet above ground level.  Every pole in the Glacier Point Line, with the exception of the riser pole, had climbing pegs at the same heights.  (Testimony of Kent Summers.)

19.   Even with the pegs removed below at 7'6", a climber could climb the pole by climbing the flanges that support the pegs.  (Testimony of Keith Guy.)

20.   However, climbing the pole without the pegs in place is difficult.  Some of the workers had difficulty accessing the pole without the assistance of an "aid," even with the pegs installed. (Testimony of Kent Summers, Testimony of Keith Guy).

21.   At the time of the accident, the subject pole had a sticker attached to bearing the words "Proud to Be an American." (PE 148).  At the time of the accident, the sticker was not new, and had partially peeled off of the pole.  (Testimony of Kent Summers.)  The sticker was located just above the "flange" on the pole, approximately half way up the pole, at a height of fifteen or sixteen feet.  (PE 148; Testimony of Kent Summers & Steven Yu.)

22.   The sticker had not been seen by a park employee prior to the incident.  (Testimony of Kent Summers).

23.   There is no evidence that the pole was dangerous or defective, and it was implemented for its intended use.

**C.   <u>Relevant Regulations & Standards</u>.**

24.   State of California Rules of Overhead Electric Line Construction prescribed by the Public Utilities Commission of the State of California, General Order 95 ("GO 95") became effective on July 1, 1942.  (PE 179, GO 95, at 3.)

25.   GO 95 provides that every high voltage power pole be marked with high voltage signs located no more than 40 inches below the lowest line conductors; that the lowest climbing peg on any high voltage pole should be no lower than 7'6" feet from ground level; and that latticed towers located near frequently traveled trails should be "guarded" to prevent easy climbing of the towers by young persons who do not realize the danger of contact with live conductors.  GO 95 contains no provisions regarding the guarding of non-latticed electric poles.  (GO 95, Rules 51.6 & 51.7.)

26.   The stated purpose of GO 95 is to "formulate, for the State of California, uniform requirements for overhead electrical line construction, the application of which will insure adequate service and secure safety to persons engaged in the construction, maintenance, operation or use of overhead electrical lines and to the public in general."  (GO 95 Rule 11.)

27.   General Order 95 only formally applies to poles constructed after its effective date, 1941.  (Testimony of Robert Armstrong; GO 95 Rule 12.3.)

28.   The accident pole was erected in approximately 1928 and has not been reconstructed or altered since that date.

**6**

(Testimony of Kent Summers, Testimony of Paul Laymon, Defendant's Exhibits ("DE") 209 and 210.)

29.   A new riser pole (Pole one) was installed in approximately 1997 at the lowest point of the Glacier Point Line. The riser pole was constructed in accordance with a Project Manual, which required that all climbing pegs below ten feet be removable pegs.  (PE 175 at 16372-6.)

30.   Robert Armstrong testified that it was the intent of GO 95 that all pre-existing poles should eventually be brought into conformity with its provisions.  Armstrong appears to have been making reference to the following language in Decision No. 34884 before the Railroad Commission of the State of California, which adopted GO 95:

> Under the terms of the new general order, existing facilities lawfully erected in accordance with earlier general orders, are permitted to be maintained according to the rules effective when such facilities were constructed or reconstructed, except as to certain safety factor requirements specified in Rule 12.2;[1] but any lines constructed or reconstructed after the new general order becomes effective, must comply with the rules therein contained.  In other words, the new general order does not require a complete and immediate reconstruction of existing lines installed prior to its effective date.  Such an order would be unreasonable to operator and to the public alike.  The new order, like its predecessors, is part of a long-range progressive program designed to eventually bring all lines up to the standards required in new construction.  Completion of that program is not economically feasible within a short period and, in fact, the revision of the order at this time clearly indicates that no program may be considered completed and static.  There is another phase to the adoption of rules such as these, in that

---

[1]   The safety factor requirements referenced in Rule 12.2 concern "allowable ratios of ultimate strengths of materials to the maximum working stresses...," as set forth in Rule 44, et seq.  These safety factor requirements have nothing to do with peg height, warning signs, or guarding.

the rules must not only be practical, from a physical point of view, but likewise they must be within reasonable economic limits; otherwise costs to serve and consumer rates may be adversely and unreasonably affected.  Having in mind these considerations, Rule 12.3 in the new general order permits prior construction to remain in service and provides as follows:

> "12.3    Lines Constructed Prior to This Order
>        The requirements of this Order, other than the safety factor requirements specified in Rule 12.2, do not apply to lines or portions of lines constructed or reconstructed prior to the effective date of this Order.  In all other particulars, such lines or portions of lines shall conform to the requirements of the rules in effect at the time of their construction or reconstruction."

(PE 179 at 15-16.)

31.  Robert Armstrong also testified that GO 95 required guarding (i.e. fencing or placing a barrier around) any "readily climbable pole," but GO 95 does not utilize this terminology. Rather, GO 95 Rule 51.6(B) provides:

> Where the pole or structure is of latticed metal or of similar construction and supports supply conductors in excess of 750 volts and is located in urban districts, or in rural areas adjacent to schools, dwellings, permanent or seasonal camps, or in orchards, or near roads, or trails which are frequently traveled, a barrier shall be so located on the pole or structure as to prevent easy climbing.

> Note: It is the intent of Rule 51.6-B to require such guarding as will prevent easy climbing of these poles or structures by young persons who do not realize the danger of contact with live conductors supported thereon. It is not intended that such guarding will be required in sparsely settled districts, mountainous and desert areas, and similar locations.

(PE 179 (emphasis added).)

32.  Prior to the adoption of GO 95, the applicable standards in California were the Rules for Overhead Electric Line Construction prescribed by the Railroad Commission of the State

**8**

of California, General Order 64 ("GO 64").  GO 64 generally
requires that lines be maintained in a condition which insures
the safety of utility personnel and the public, but contained no
provisions regarding "guarding" or fencing of electric poles.  GO
64 also required that pegs be no lower than 7'6" and that a high
voltage warning sign be located on the cross arms of any high
voltage pole.  (Testimony of Robert Armstrong).

33.   Robert Armstrong opined that it would have been good
practice to have guarding around this pole, although it was not
actually required by GO 95.  GO 95 Rule 13 provides that poles
should be maintained in accordance with good practice for local
conditions.  (Testimony of Robert Armstrong.)

34.   The National Electric Code is not followed by high
voltage electricians in California.  (Testimony of Robert
Armstrong.)

**D.   Maintenance and Operation of the Glacier Point Line.**

35.   The Government's High Voltage Electric Operations Shop
("High Voltage Operations Shop"), located in Yosemite Valley,
operates and maintains the Glacier Point Line.  (Testimony of
Kent Summers.)

36.   The government electricians referenced GO 95 for
guidance in operating the high voltage electrical system.
(Testimony of Paul Laymon; Kent Summers.)  For example, although
he believed that GO 95 was generally a "construction document,"
Kent Summers, an electrician who works in the High Voltage
Operations Shop, used GO 95 as a reference "for various issues
that might come up."  (Testimony of Kent Summers.)

**9**

37.  In response to requests for production of documents, the United States produced a copy of GO 95, representing that it was "used as guidance by the National Park Service at Yosemite." (PE 179.)

38.  Robert Armstrong, Plaintiffs' expert, opined that the knowledge of government electricians regarding applicable maintenance standards was "minimal." (Testimony of Robert Armstrong.)

39.  Kent Summers testified that, prior to the accident, he may not have been aware of the high voltage marking requirement contained in GO 95.  (Testimony of Kent Summers.)

40.  Paul Laymon, who now oversees the High Voltage Operations Shop and worked in it from 1987 to 1997, believed that GO 95 required a yellow sign to be posted on the cross arms of any high voltage pole.  He also believed that GO 95 required that there be no pegs below <u>four</u> feet.  He recalls that during the early part of his career, which began in the late 1970s, he inspected all of the lines in the Park and removed any pegs that were below four feet.  (Testimony of Paul Laymon.)

41.  Donald Coon, Supervisor of the High Voltage Operations Shop, directed that his employees should comply with GO 95 to the extent possible in order to keep the system safe.  (Testimony of Donald Coon.)

42.  Although there were no warning signs on the subject pole on the date of the incident, it was the normal custom and practice of the High Voltage Operations Shop to have warning signs on the poles.  At the time of the accident, there <u>was</u> a warning sign on the crossarms of at least one other pole in the

**10**

Glacier Point Line, the riser pole.  (Testimony of Kent Summers, Keith Guy, and Paul Laymon.)

43.  Warning signs would generally be placed at "about eye level" on a steel pole.  The signs used on steel poles were yellow stickers with black lettering, which were approximately four inches wide by approximately twelve inches high.  (Testimony of Kent Summers.)

44.  It was the normal custom and practice to inspect the poles and lines on an annual basis.  Any inspections of the overhead power lines by Government electricians are performed by "walking the line," i.e., walking below the line and using binoculars to look for equipment in need of repair.  Workers would specifically look to see that warning signs are in place. (Testimony of Kent Summers.)

45.  The accident pole is located in an area where the weather conditions are harsh, including heavy snow, rain, and rockfall.  (ASF #7.)

46.  The Four Mile Trail is closed and the pole is largely inaccessible during the winter.  The trail opens for hiking in the early spring, depending on the weather conditions and whether there is snow remaining on the trail.  (ASF #7.)

47.  As of the date of the incident, May 9, 2004, the High Voltage Operations Shop had not yet been able to access the poles on the Glacier Point Line to check on the status of the signs, which often erode or fall off during the harsh winter. (Testimony of Kent Summers, Donald Coon.)

48.  The High Voltage Operations Shop usually waited until the Glacier Point Road was open, so that they could drive to the

**11**

top of the line, where they would have easy access to their gear. This would permit them to perform an inspection working from the highest point on the line down to the valley. (Testimony of Kent Summers.)

49. The High Voltage Operations Shop did not maintain a log or other form of record of when each line was inspected. (Testimony of Kent Summers.)

50. Other than the evidence that it was the High Voltage Operations Shop's normal practice to inspect each line every year, there is no evidence that the Glacier Point Line had been inspected at any time after 2002. Any such inspection would have been performed by one of the high voltage electricians. In 2003, this would have been either Donald Coon, Howard Keith, Kent Summers or Keith Guy. Mr. Coon testified that he was last on the Glacier Point Line in 1997; Howard Keith started with the High Voltage Operations Shop in the fall of 2003 (after the accident); and neither Mr. Summers nor Mr. Guy specifically remembers inspecting the line in 2003. (Depositions of Donald Coon & Howard Keith, Testimony of Keith Guy, Kent Summers.)

51. Paul Laymon, Facility Manager for Utilities, has seen numerous items, including bandanas and signs, ten to twelve feet up on power poles in Yosemite over the time he has been working there. This indicated to him that poles may have been climbed by park visitors or that these items had been hoisted up the poles. But, most of these items were on wood poles down in Yosemite Valley, not on remote poles like those on the Glacier Point Line. Moreover, none of these items were located up near the wires. (Testimony of Paul Laymon.)

**12**

52.  Warning signs located near the crossarms of poles were observed to go missing on occasion by Government electricians.

53.  Kent Summers testified that he and other High Voltage Operations Shop personnel thought either theft or weather might explain why some warning signs went missing.  He did not specifically associate theft with those signs that went missing from the crossarms.  Rather, he mentioned theft in the context of testimony regarding the sticker warning signs, normally placed at eye level.  (Testimony of Kent Summers.)

54.  There are over 3.5 million visitors a year to Yosemite. There are over 200 search and rescues a year in Yosemite. (Testimony of Steve Yu.)  There has never been an injury or death in Yosemite from climbing an electric power pole, even though the subject pole has been unchanged in the same location for over 70 years.  (Testimony of Steve Yu, Kent Summers, Paul Laymon, Keith Guy; DE 209 & 210.)

55.  No witness ever saw any individual, other than a utility worker, climbing the utility poles.  (Testimony of Steve Yu, Kent Summers, Paul Laymon, Keith Guy; Deposition Testimony of Donald Coon, Edward Visnovske.)

56.  Following the accident, the High Voltage Operations Shop removed pegs lower than 7'6" from all the poles on the Glacier Point Line.  (Testimony of Paul Laymon, Kent Summers.)

57.  Also following the accident, there was some discussion among the employees of the High Voltage Operations Shop as to whether removing the pegs would serve any purpose, as some believed the saddles affixed to the poles could be climbed without the pegs in place.  (Testimony of Kent Summers.)

**13**

58.   No one considered removing the saddles to make the pole less climbable, as this would have made them too hard to maintain.  (Testimony of Kent Summers.)

59.   Following the accident, the High Voltage Operations Shop ensured that warning signs were placed on all high voltage power poles in Yosemite, including the poles on the Glacier Point Line.  At least some of the poles on the other high voltage lines already had warning signs.  Weather causes considerable damage to the signs. (Deposition testimony of Howard Keith.)

**E.    Additional Circumstances of the Accident.**

60.   Mr. Muchhala began his hike at the Four Mile trailhead.

61.   There are two gates on the Four Mile Trail.  The lower of these two gates, which lies within a few hundred yards of the start of the trail, was open.  The trail was open from there to at least the second gate, which is located approximately three quarters of the way up the trail, well past the accident scene. (Testimony of Steven Yu.)

62.   The sign at the trailhead states "dangerous to stray from trail."  (Testimony of Steven Yu, Joint Ex. 11).

63.   Under most circumstances, however, including along the Four Mile trail, it is permissible to leave designated trails. (Testimony of Steven Yu.)

64.   Mr. Muchhala went off the four mile trail at the first hairpin turn.

65.   If a person walked off of the trail at the first hairpin turn and looked left (downhill), they would see the riser pole (Pole #1).  If the person looked right instead (uphill), they would see two more electrical poles (Poles #2 & #3).

**14**

66. There is a field of boulders used by climbers for recreational purposes at the base of the Four Mile Trail, but the boulders under the Glacier Point Line are not part of any established bouldering area.  (Testimony of Steven Yu.)

67. Mr. Muchhala was wearing climbing shoes when he climbed the electricity towers.  He had changed into them after leaving the Four Mile Trail.  (Testimony of Steven Yu; PE 176.)

68. Mr. Muchhala's backpack and other personal effects were found on the ground between pole three and pole four.  (Testimony of Steven Yu.)

69. Before climbing the subject pole, Mr. Muchhala wrote "At the first hairpin turn up the 4 mile hike in Yosemite Valley. [sic] I slingshot off into the boulders then roll down the hillside.  Swapped to my climbing shoes and was agile as a gazelle!  Doing prince of Persia moves, jumping from rock to rock.  Having a backpack and a bag of painting supplies really slows me down.  Can do maybe 1/3 of the moves.  Climbed 2 electricity towers and am just below the third...."  (PE 176)

70. Mr. Muchhala was standing on the lower cross arms and resting his hips on or near the upper cross arms when he was shocked.  (Testimony of Robert Armstrong, Mark Rhodes.)

71. The two primary contact points were his left hip and left foot.  There were no burns on his hands, indicating he did not touch or grab the conductor lines with his hands.  Instead, the current arced from the jumper into his left hip prior to physical contact between his body and the jumper.  (Testimony of Steven Yu, Robert Armstrong, and Mark Rhodes.)

**15**

72. After the accident, there was a burn mark on the lower cross arm. There was also burned nylon or melted nylon on one of the jumper cables on the upper cross arm on the trail side of the pole. (Testimony of Kent Summers.)

73. There were no broken or down lines after the accident. (Testimony of Kent Summers.)

74. Mr. Muchhala was approximately 30 feet up on the pole when he fell from it. (Testimony of Robert Armstrong, Mark Rhodes.)

75. Mr. Muchhala was not using any fall protection when he fell from the pole. (Testimony of Mark Rhodes, Steven Yu.)

76. An inherent risk of climbing a 30 foot structure without adequate fall protection is falling and suffering injury. (Testimony of Steve Yu, Mark Rhodes.)

77. An inherent risk of climbing an "electricity tower" is electrocution. (Testimony of Mark Rhodes.)

78. Mr. Muchhala climbed the utility pole for "enjoyment or thrill," not because he was lost or disoriented.

79. Susan Whittier, who along with her husband and son witnessed Mr. Muchhala falling to the ground, initially thought Mr. Muchhala fell from the cliffs above as she could not believe anyone would climb a power pole. (Deposition Testimony of Susan Whittier.)

80. Mr. Muchhala's death was deemed an accident. He did not commit suicide. (Testimony of Steven Yu.)

81. Mark Rhodes, an expert on the biomechanics of electrocution, testified that it was likely that Mr. Muchhala died as a result of the fall, not the electric shock. He

**16**

explained that strong shocks can sometimes be less deadly than shocks of lesser intensity.  He also opined that the fact that one of the first responders indicated that Jay Muchhala was exhibiting pulseless electrical activity (PEA) after the accident is evidence that the electrocution did not stop the electric activity of his heart.  Moreover, the path the current took was through the lower body.  However, the electric shock may have caused him to lose control of his muscles, leading to the almost involuntary reflux of pushing away from the source of the shock. (Testimony of Mark Rhodes.)

**F.** **Other Evidence Regarding Common Knowledge & Dangers of High Voltage Power Lines.**

82.  Robert Armstrong testified that, in his experience, laypersons do not commonly understand that electricity can arc away from a high voltage line and shock a person before that person even touches the line.  (Testimony of Robert Armstrong.)

83.  Robert Armstrong also testified that having knowledge that a pole was an electric pole does not necessarily equate to having a full understanding of the dangers associated with a high voltage electric pole.  The purpose of high voltage warning signs is to put persons on notice that they are not just dealing with electricity, but with high voltage electricity.  (Testimony of Robert Armstrong.)

84.  Steven Yu testified about the effectiveness of warning signs.  Specifically, the National Park Service ("NPS") maintains warning signs at the top of every major waterfall in the Yosemite, warning people not to swim at the top of the waterfall. Yet, people frequently disregard the warnings, sometimes with

**17**

tragic results.  Steve Yu indicated that the purpose of warning signs in the Park is to warn people about hazards they are not used to encountering (animals, waterfalls, etc.).  (Testimony of Steven Yu.)

**G.**   **Decedent's Relationship With His Family & Friends**.

85.  Plaintiff Kant Muchhala, Decedent's father, was 62 as of the date of the death of his son.

86.  Plaintiff Carolyn Muchhala, Decedent's mother, was 60 as of the date of the death of her son.

87.  Jay Muchhala had no alcohol or drugs in his system at the  time of his fall.  (Agreed Statement of Facts, No. 11.)

88.  Jay Muchhala was in excellent health at the time of his death.

89.  Jay Muchhala maintained an extremely close and loving relationship with his parents, other members of his family, and friends.  It is undisputed that his death was a tragic and excruciating loss to all of them.  (Testimony of Hedi Leinz, Kant Muchhala, Carolyn Muchhala.)

90.  At the time of his death, Jay Muchhala was residing and employed in San Francisco, California.  His parents were residents of Wisconsin.

**III.   CONCLUSIONS OF LAW**

**A. Federal Tort Claims Act.**

1.   This action is brought pursuant to 28 U.S.C. § 1331, federal question jurisdiction, under the Federal Tort Claims Act ("FTCA").  The FTCA waives the federal government's immunity as to torts committed by government employees in the scope of their

employment, 28 U.S.C. § 1346(b), and makes the government liable "in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 2674.

2.   Here, even though the relevant events took place within the boundaries of Yosemite National Park, an exclusive federal enclave, 16 U.S.C. § 57, it is undisputed that California tort law provides the applicable substantive law with respect to the underlying tort claim.

3.   The FTCA is a limited waiver of sovereign immunity which preserves the immunity of the United States from tort liability in a number of circumstances.  One such circumstance is covered by the "discretionary function exception," which provides that the United States will not be liable for "[a]ny claim... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a). Defendant asserts that the discretionary function exception applies here.

4.   A court must apply a two-part test to determine whether the discretionary function exception applies.  The first inquiry is whether the challenged conduct is "discretionary-that is, it must involve an element of judgment or choice." *Kelly v. United States,* 241 F.3d 755, 760 (9th Cir. 2001)(citing *Berkovitz v. United States*, 486 U.S. 531 (1988).)  If the decision concerns "a federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow," the exception does not apply. *Berkovitz*, 486 U.S. at 536.  The

**19**

second inquiry is whether the judgment is "of the kind that the discretionary function exception was designed to shield." *Id.* Decisions about the implementation of safety considerations have been protected by the exception where "circumstances clearly showed [the decisions] were the result of a judgment grounded in social, economic and political policy." *Soldano v. United States*, 453 F.3d 1140, 1146 (9th Cir. 2006). The government bears the burden of proving both elements. *Kelly*, 241 F.3d at 760.

5.   Plaintiff alleges that Defendant failed to follow standard electrical power industry practices with respect to the poles on the Glacier Point Line. Specifically, Plaintiff alleges that Defendant failed to post proper high voltage warning signs on the poles, failed to remove climbing pegs situated below 7'6" from ground level, and failed to erect a guard fence around the pole. Although industry standards arguably required such protective measures, no law, rule or regulation <u>required</u> that the United States take these precautions. Accordingly, the extent to which any such precautionary measures are taken involves an element of discretion.

6.   The Ninth Circuit has suggested that this type of decision is not "of the kind that the discretionary function exception was designed to shield." For example, in *Seyler v. United States*, 832 F.2d 120 (1987), the plaintiff claimed that the Bureau of Indian Affairs ("BIA") was negligent in failing to erect a speed limit sign on a particular road. The Ninth Circuit held that the BIA's failure was not "grounded in social, economic or political policy." *Id.* at 123. The Ninth Circuit also

"doubt[ed] that any decision not to provide signs would be of the nature and quality that Congress indented to shield from tort liability." *Id.* Similarly, in *ARA Leisure Services v. United States*, 931 F.2d 193, 195-96 (9th Cir. 1987), the Ninth Circuit examined two situations in which NPS was accused of negligence in connection with road construction and maintenance in Denali National Park.  The Ninth Circuit found that NPS's decision to design and construct a road without guardrails was shielded by the discretionary function exception because the choice was grounded in policy considerations such as esthetics and minimal impact construction.  *Id.*  However, NPS's failure to maintain a different road in a safe condition was not the kind of decision Congress intended to be shielded by the discretionary function exemption.  *Id.*

7.   Here, the "decision" not to post warning signs or remove pegs below a certain height is not shielded by the discretionary function exception.  First, the government has offered absolutely no evidence to suggest that any decision-making of a policy nature was involved.  NPS's alleged failures in this case are more like failing to properly maintain a road, to which the discretionary function exception was not applied in *ARA Leisure*.[2]

---

[2]    The government also argues that the "decision" not to guard the pole (with a fence or other obstruction) concerns policy matters that must be balanced, such as resource allocation, visitor experience in the park, and the impact of man-made structures in wilderness.  There is some merit to this argument.  However, in this case, the guarding provisions contained within GO 95 and GO 64 are inapplicable, as they apply only to latticed poles.

8.   Defendant does not suggest the government's decisions at issue in this case -- to place warning signs, to remove climbing pegs, or to otherwise guard against climbing by unauthorized persons -- have any political significance, as no such significance could attach to such decisions.

**B.   Negligence Per Se.**

9.   California Evidence Code § 669 provides that a rebuttable presumption of a defendant's negligence is created if "(1) [defendant] violated a statute, ordinance, or regulation of a public entity; (2) [t]he violation proximately caused death or injury to person or property; (3) [t]he death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) [t]he person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."

10.   The magistrate judge previously ruled that the doctrine of negligence per se may not be asserted against the United States in this case because the regulations that were allegedly violated were not applicable to the federal government entity at the time of the alleged negligence.   (Doc. 36, Order on Mot. for Sum. J., at 9.)   NPS representatives testified at trial they endeavor to follow GO 95, making GO 95 and its predecessor, GO 64, otherwise relevant.   However, there was no proof that these rules were binding on the United States.   There is no reason to disturb the magistrate judge's decision.

**C.   Primary Assumption of Risk**.

11.   The doctrine of primary assumption of risk is a complete defense to a negligence claim.  "Where, by virtue of the nature of the activity and the parties' relationship to the activity, defendant owed no legal duty to protect plaintiff from the particular risk of harm that caused the injury (so-called 'primary assumption of the risk'), plaintiff is completely barred from recovery."  *Knight v. Jewett*, 3 Cal. 4th 296, 308-309, (1992).

12.   Defendant asserts that the primary assumption of the risk doctrine should bar recovery in this case because decedent assumed the risk of electrocution.

13.   A key factor in determining whether the doctrine of primary assumption of the risk applies is the nature of the activity and the role of defendant whose conduct is at issue. *Id*. at 313.

14.   Whether defendant owes a duty of care is a legal question "which depends on the nature of the sport or activity in question and on the parties' general relationship to the activity...."  *Id*.  "In general, the doctrine applies to activities or sports where 'conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself.'"  *Saville v. Sierra College*, 36 Cal. Rptr. 3d 515, 521 (Cal. App. 3 Dist. 2005)(quoting *Knight*, 3 Cal. 4th at 315).

15.   For the most part, the primary assumption of the risk doctrine is applied to cases involving sporting activities (or other related forms of recreation).  For example, the *Knight* court discussed skiing as an example of a circumstance in which

**23**

the primary assumption of the risk doctrine might apply,
reasoning that "although moguls on a ski run pose a risk of harm
to skiers that might not exist were these configurations removed,
the challenge and risks posed by the moguls are part of the sport
of skiing, and a ski resort has no duty to eliminate them."
*Knight*, 3 Cal. 4th at 315.  "In these types of activities, the
integral conditions of the sport or the inherent risks of
careless conduct by others render the possibility of injury
obvious, and negate the duty of care usually owed by the
defendant for those particular risks of harm.  A duty imposed in
those situations would significantly change the very purpose or
nature of the activity."  *Seville*, 133 Cal. App. 4th at 522.

16.  "While Commercial sponsors and operators of a sporting
activity have a duty not to increase the risks inherent in the
activity, the overriding consideration in the application of
primary assumption of risk is to avoid imposing a duty which
might chill vigorous participation in the implicated activity and
thereby alter its fundamental nature."  *Regents of the Univ. of
Calif. v. Roettgen*, 41 Cal. App. 4th 1040, 1046 (1996) (emphasis
added).

17.  Cases similar to the skiing example given in *Knight* are
myriad.  *See Saville*, 36 Cal. Rptr. 3d at 525 (applying primary
assumption of the risk doctrine to bar recovery by a student
injured practicing arrest and control techniques during a peace
officer training course); *Ferrari v. Grand Canyon Dories*, 32 Cal.
App. 4th 248, 253 (1995)(primary assumption of the risk doctrine
barred recovery by individual injured while whitewater rafting
when head struck metal frame of raft; owner of the rafting

**24**

company did not increase the inherent risks of the sport); *Roettgen*, 41 Cal. App. 4th at 1046-47 (primary assumption of the risk barred recovery by individual injured during rock climbing class; "risk of harm was not beyond that inherent in any top rope climbing activity."); *see also Moser v. Ratinoff*, 105 Cal. App. 4th 1211 (2003) (long distance bicycle race); *Peart v. Ferro*, 13 Cal. Rptr. 3d 885 (2004) (minor operating a motor craft); *Calhoon v. Lewis*, 81 Cal. App. 4th 108, 115 (2000) (skateboarding); *Vine v. Bear Valley Ski Co.*, 118 Cal. App. 4th 577 (2004) (snowboarding); *Lackner v. North*, 37 Cal. Rptr. 3d 863 (2006) (skier struck by snowboarder); *Souza v. Squaw Valley Ski Corp.*, 138 Cal. App. 4th 262  (2006) (child skier's collision with plainly visible aluminum snowmaking hydrant); *Kahn v. East Side Union High School Dist.*, 31 Cal. 4th 990 (2003) (high school student injured at swim meet).

18.   Defendant correctly asserts that the doctrine of assumption of the risk is not limited in application only to "sports" but also applies more broadly to some types of "activities" that resemble sports. *Rostai v. Neste Enterprises*, 138 Cal. App. 4th 326, 329 (2006).  Specifically, an "activity" may qualify as a "sport" for purposes of the primary assumption of the risk doctrine if the activity is done for enjoyment or thrill, requires physical exertion as well as elements of skill, and involves a challenge containing a potential risk of injury. *Record v. Reason*, 73 Cal. App.4th 472, 482 (1999).  For example, in *Record*, the activity of "tubing" –- riding behind a motorboat on an inner tube –- was found to be subject to primary assumption of risk because it involved physical exertion, elements of skill,

**25**

and is done for enjoyment or thrill.  Similarly in *Rostai*,
working out in a gym with a personal fitness trainer was deemed
an activity subject to the primary assumption of risk doctrine.

19.   The underlying purpose of the primary assumption of the
risk doctrine is "to avoid imposing a duty which might chill
vigorous participation in the implicated activity and thereby
alter its fundamental nature." *Roettgen*, 41 Cal. App. 4th at
1046.  Here, unlike with tubing, working out in a gym, skiing, or
even rock climbing, the activity in which Jay Muchhala engaged,
climbing a high voltage electric pole, is not an activity the
vigorous participation in which should be encouraged.  To the
contrary, the numerous regulatory provisions discussed in this
case, which require warning signs and discourage access to
electric poles impose duties of care designed, at least in part,
to prevent the activity from taking place.  The risks raised by
electric pole climbing, falling and electrocution, are not ones
that have any value as "sport" nor is such activity deserving of
encouragement.  The primary assumption of the risk doctrine does
not apply here.

**D.   Overview of California Negligence Principles**.

20.   California Civil Code § 1714 provides: "Everyone is
responsible, not only for the result of his or her willful acts,
but also for an injury occasioned to another by his or her want
of ordinary care or skill in the management of his or her
property or person, except so far as the latter has, willfully or
by want of ordinary care, brought the injury upon himself or
herself. The design, distribution, or marketing of firearms and
ammunition is not exempt from the duty to use ordinary care and

**26**

skill that is required by this section." This statutory provision "serves as the foundation" of California's negligence law. *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968), superceded by statute on other grounds as stated in *Perez v. Southern Pac. Tansp. Co.*, 218 Cal. App. 3d 462, 467 (1990).

21. A plaintiff in a negligence action must establish "[1] that the defendant owed the plaintiff a legal duty, [2] that the defendant breached the duty, and [3] that the breach was a proximate or legal cause of his or her injuries." *Ambriz v. Kelegian*, --- Cal. Rptr. 3d ---, 2007 WL 172015, *6 (Cal. App. 4 Dist.).

22. The existence of a legal duty on the part of a person in the defendant's situation to the class of persons of which plaintiff is a member is a question of law for the court, while issues of due care, causation, and contributary fault are questions of fact for the jury. 6 Witkin, Summary 10th, Ch. IX, Torts, § 860 (2005).

**E.   <u>The Existence of a Legal Duty</u>**.

23. The question of whether the defendant owes the plaintiff a duty of care is usually treated as a threshold question. Whether a duty exists is an "expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Dillon v. Legg*, 68 Cal.2d 728, 734 (1968).

24. In California, the general rule is that all persons have a duty "to use ordinary care to prevent others being injured as the result of their conduct...." *Rowland*, 69 Cal.2d at 112; Cal Civ. Code § 1714.

**27**

25.   A specific line of cases concerning operators of power lines holds that such operators have a duty to "make [their] wires 'safe under all the exigencies created by the surrounding circumstances.' Thus, [the operator] has a choice 'either to insulate the wires or to locate them to make them comparatively harmless.'"   *Scally v. Pacific Gas & Electric Co.*, 23 Cal. App.3d 806, 815-16 (1972).

26.   Where, as in this case, a line is not insulated, the operator has a duty to locate the line in such a way as to make it "comparatively harmless."   *Id.*

27.   However, courts do depart from general duty rules under certain circumstances.  A number of considerations are relevant to a court's determination of whether a departure from the general rule is appropriate: "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved."   *Rowland*, 69 Cal. 2d at 113.

28.   The foreseeability of a particular kind of harm is particularly critical to the analysis.   *Dillon*, 68 Cal.2d at 739.  It is error, however, for a court to <u>only</u> consider foreseeability when analyzing whether any duty is owed to Plaintiff.  All the *Rowland* factors must be considered.   *Henderson v. United States*, 846 F.2d 1233, 1236 (9th Cir. 1988).

**28**

1.   *Foreseeability*.

29.   The most important *Rowland* factor is foreseeability. "[T]he obligation to refrain from...particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails." *Dillon*, 68 Cal.2d at 739 (quoting 2 Harper & James, The Law of Torts (1956), at 1018).[3]

30.   "The degree of foreseeability necessary to warrant the finding of a duty will...vary from case to case.  For example, in cases where the burden of preventing future harm is great, a high degree of foreseeability may be required.  On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." *Romito v. Red Plastic Co.*, 38 Cal. App. 4th 59, 66 (1995).

31.   California courts have drawn lines around the various roles the court and jury would usually play in this forseeability

_____

[3]   "The existence of a duty of care is a separate issue from the question whether (on the basis of forseeability among other factors) a particular defendant <u>breached</u> that duty of care, which is an essentially factual matter." *Kockelman v. Segal*, 61 Cal. App. 4th 491, 498 (1998) (emphasis added).  Foreseeability is relevant to both inquiries: the existence of a duty of care; and, if a duty of care is found to exist, whether that duty has been breached.  *See* 6 Witkin, Ch. IX, § 868 (citing *Bilyeu v. Standard Freight Lines*, 182 Cal. App. 2d 536, 542, (1960) ("Many of the circumstances involved in a consideration of the foreseeability of an occurrence which will determine the existence of a duty to exercise due care toward a particular person may...be equally pertinent in considering the test of foreseeability of an injury to determine whether a precedent act of negligence proximately caused that injury.")).

analysis: "[A] court's task-in determining 'duty' - is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Ballard v. Uribe*, 41 Cal. 3d 564, 572 n.6 (1986).  If reasonable factfinders could differ as to foreseeability of the harm, this issue would be left for the jury to decide.  *See Bigbee v. Pac. Tel. & Tel. Co.,* 34 Cal. 3d 49, 56 (1983).  The jury would then consider "the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent...." *Ballard*, 41 Cal. 3d at 572 n.6.

32.  Here, however, where the court is the finder of both fact and law, it is appropriate for the court to determine whether, under the facts and circumstances of this case, it is reasonable to impose a duty on the United States to prevent the harm that occurred here.  *See, e.g., Henderson*, 846 F.2d 1233 (affirming district court finding that no duty was owed after bench trial in FTCA case).

33.  Some general guidance can be taken from California cases which have discussed foreseeability when determining whether a legal duty exists.  For example, in *Robison v. Six Flags Theme Parks Inc.*, 64 Cal. App. 4th 1294 (1998), the owners of the Magic Mountain theme park maintained a flat grassy area with tables for picnickers within a large, paved parking lot. The picnic area was in line with the traffic flow (which was subject to a 25 mile per hour speed limit), but was uncurbed.

Plaintiffs, who were picnicking at a table, were injured when a car drove over the word "stop" painted on the pavement and crossed 40 feet of grass before striking their table.  The car, which had a malfunctioning starter motor, had been push-started and had, at the wheel, a developmentally disabled woman who had never driven a car before.  The California Court of Appeal, Second District, held that the unique circumstances of the accident did not absolve Magic Mountain of liability, concluding that "it was open to simple observation that Magic Mountain had aimed a heavily traveled parking lane...directly at the picnic table with no separation other than 40 feet of flat grass, and that a car traveling at a speed no higher than Magic Mountain's own speed limit would cover this distance in less than 2 seconds.... When such an observable danger ripens into an accident, the accident is foreseeable for purposes of duty analysis."  *Id*. at 1301.

34.  Hence, the relevant inquiry in this case is whether it was reasonably foreseeable, in view of all the circumstances, including the location of Pole Four, the use of the Four Mile Trial, and other observable evidence, that an adult might climb the thirty-foot accident pole and be injured as a result.

35.  The Ninth Circuit's opinion in *Henderson*, 864 F.2d 1233, provides some guidance in this analysis.

a.  In *Henderson*, two individuals were injured trying to steal copper wire from a power pole near a water tank on an abandoned military installation.  The two trespassed through a breach in a fence, past signs that warned "Government Property No Trespassing."  One of the two, Harmon, climbed a thirty three foot power pole with the assistance of spiked shoes and a safety

belt.  As he attempted to cut copper cable from the pole, Harmon touched an exposed live wire.  His partner, Henderson, who was standing on the ground, saw a flash and saw Harmon's body lurch backwards.  Henderson climbed the pole in an effort to provide aid to Harmon, but Henderson also contacted a live wire, received a shock, and fell to the ground.  His fall left him permanently paralyzed.  *Henderson*, 827 F.3d 1233, 1234 (9th Cir. 1986)(opinion withdrawn and superceded in part by *Henderson*, 846 F.2d 1233).

b.    The Ninth Circuit agreed with the district court's conclusion that the accident was not foreseeable.  Specifically, although there was some indication that members of the public entered the facility to "sightsee, picnic, drink beer, have parties, spray paint graffiti, commit vandalism, and take copper wiring and other material" in a nearby area within the abandoned military installation, "[t]here was no evidence of tampering with pole lines which reasonably should have put cognizant employees of the United States on notice that members of the public might enter the facility and climb the poles to remove or tamper with conductors."  846 F.2d at 123.  This latter fact, the Ninth Circuit found to be adequate to support the district court's conclusion that the accident was not foreseeable.  *Id.*

c.    "Despite the presence of picknickers and vandals, the government had little reason to foresee that thieves might climb the power poles to steal copper wires."  *Id.* at 1235.  The Ninth Circuit rejected Henderson's argument that a few references in the record to "cut tail-ends and dangling wires...should have put the government on notice that thieves were active in the

**32**

area...."

> Although the record does contain references to cut tail-ends and dangling wires-items that Henderson argues should have put the government on notice that thieves were active in the area-we have found no evidence in the record that these cut tail-ends or dangling wires were cut and dangling prior to Henderson's accident. The sole exception, one reference to wires cut by the government prior to the accident, does not support Henderson's claim. Wires cut by the government before the accident could not have notified the government of the presence of thieves.

> Henderson's attorney attempted to prove at trial that some wires left dangling after the accident were in fact dangling prior to the accident, and that these wires had been left in that state by Harmon on his previous trip to the facility. However, Henderson himself testified that he did not notice any dangling wires before the accident. In light of the uncontradicted testimony at trial that no wires were dangling before the accident, the district court did not commit clear error by concluding that no telltale signs reasonably afforded the government notice of tampering before the accident.

> The only evidence of prior thefts proved at trial that might have put the government on notice was the absence of the wires stolen by Harmon on his previous trip to the site. However, in the vast area that the government had to patrol, with a tangle of wires overhead, we cannot say that the government should have noticed the absence of a few wires. Thus, the district court's finding that the accident was not foreseeable was supported by the record because no evidence of tampering prior to the accident was so apparent that the government should have recognized the potential for Henderson's injury.

*Id.* at 1235-36.

36. Here, even when viewed with the benefit of hindsight, and considering any evidence that suggests the partial climbing of electric poles by visitors was foreseeable, there is no evidence suggesting that anyone person had previously climbed an electric pole in Yosemite to the height of the electric wires, other than authorized NPS maintenance personnel.

a.   Paul Laymon, who was supervisor of the High Voltage Operations Shop for ten years and presently oversees its

operations, testified that he had seen items up on the poles in Yosemite valley on occasion.  For example, he had seen a bandana tied ten feet up a pole in the valley and he had seen sticker on a metal pole once.  He specifically acknowledged that none of these items were ever found in the wires.

b.   At the time of the accident, there was, in fact, a sticker placed half way (fifteen or sixteen feet) up the accident pole.

c.   The subject pole was approximately 50 feet from the Four Mile Trail, which is frequently hiked by park visitors, although a boulder field had to be traversed to reach the pole from the trail.

d.   Donald Coon, in deposition testimony entered into evidence, testified that some metal high voltage warning signs that had been located up in the wires occasionally went missing.

i.   Plaintiff's counsel argued that Donald Coon's deposition testimony suggested that these signs had been stolen, but Mr. Coon made no such assertion, expressly or impliedly.  He merely stated that some signs located up in the wires went missing.  Kent Summers testified that he and other High Voltage Operations Shop personnel thought either theft or weather might explain why some warning signs went missing.  But, Mr. Summers did not specifically associate theft with signs that went missing from the crossarms.  Rather, he mentioned theft in the context of testimony regarding the sticker warning signs, normally placed at eye level.  Other witnesses talked about the destructive effect of harsh weather on signs and stickers.

37.  The weight of the evidence suggests that an adult climbing one of the Glacier Point Line poles was _not_ a reasonably

**34**

foreseeable event:

a.   No witness had ever seen a member of the public climb or attempt to climb an electric pole in the Park.

b.   No other person in the preceding seventy-five years since the accident pole was erected has ever climbed a high voltage electric pole and been injured in the Park.

c.   Yosemite National Park is a popular place for rock climbing and hiking, offering numerous places to climb for enjoyment or thrill, other than power poles.

d.   The accident pole was located in a fairly remote area, at least twenty feet off of a trail, and was accessible only by scrambling over a boulder field.

e.   The accident pole was not located in a campground, picnic area, parking lot, or other area frequented by families or unsupervised children.

f.   Susan Whittier, a witness to the accident, believed at first that Jay Muchhala had fallen from a cliff, because she thought it so unlikely that he had climbed the power pole.

38.   Although Jay Muchhala may not have known that the lines held up by the accident pole carried high voltage electricity, it is undisputed that he knew he was climbing thirty foot high electric poles.

39.   Under the facts and circumstances of this case, it was not foreseeable that an adult would have climbed the accident pole to the height of the wires.

40.   As in *Henderson*, there was no evidence here which reasonably should have put cognizant employees of the United

States on notice that adult members of the public might intentionally climb up into the wires.

41. This conclusion is further supported by the fact that neither the court nor the parties have located a single case in which a duty was found to be owed to an <u>adult</u> who <u>intentionally climbed</u> an electric pole, whether high voltage or not.

42. Numerous cases have examined the duties of care owed by operators of power lines to various types of individuals who might come into contact with uninsulated wires or electrical current:

   a.   The vast majority of such cases concern children. For example, a long line of cases have sustained findings of negligence against electric companies where children are injured by coming into contact with electrical wires while climbing trees, when the risk of such harm was foreseeable. *Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680 (1998)(citing numerous cases, including *Dolata v. Ohio Edison Co.*, 2 Ohio App. 3d 293 (1981) (evidence sufficient to support finding that power company was negligent where a child was electrocuted when he came in contact with a power line while climbing a tree located on his family's property; the power line ran in close proximity to tree; the tree had not been trimmed by the power company for several years and was easily climbable with large outreaching branches); *Petroski v. Northern Indiana Pub. Service Co.*, 171 Ind. App. 14 (1976) (power company owed duty to boy injured while climbing a tree that electric company failed to trim where high voltage wires ran through the tree and the possibility of injury was foreseeable); *Alabama Power Co. v. Taylor*, 293 Ala. 484 (1975) (defendant electric company was liable where child was injured

**36**

while attempting to climb a tree with low branches that had not been trimmed in seven years and grew beside a public alley in a residential neighborhood occupied by numerous small children)).

   b.   Other cases concern <u>adults</u> who came into contact with power lines <u>indirectly and unintentionally</u>.  For example, in *Polk v. City of Los Angeles*, 26 Cal.2d 519, 526 (1945), the default standard of care -- that wires be insulated or located so as to be comparatively harmless -- applied in a case where a tree trimmer was electrocuted by wires passing through the tree on which he was working.  The municipality maintaining the wires should have anticipated that property owners would need to trim those trees.  Similarly, in *Sulphur Springs Valley Electric Cooperative, Inc. v. Beltran*, 13 Ariz. App. 513 (1970), a power company was found to owe a duty of care to an individual who was electrocuted when an antenna he was attaching to the side of a house fell and touched a 28-foot-high bare electric wire.  The court pointed out that the electric company was "required to know there is a certain amount of negligence in the world," and was required to anticipate that "some human beings will fail on occasion to behave as a reasonable man would behave."  *Id*. at 515.

   43.   Still other cases concern children who have intentionally climbed electricity poles or towers.  *C.f.*, *Arroyo v. Chicago Transit Auth*., 643 N.E. 2d 1322, 1328 (Ill. 1994)(finding no liability under attractive nuisance doctrine where there was no evidence that owner elevated train tower with electric third rail knew or should have known that children frequented the premisis).  But, "[e]ven without [] express warnings [on a pole or tower], anyone as old as [fourteen] is

charged with the knowledge that electric wires are ordinarily dangerous; that they should be avoided wherever possible...and that it is dangerous to come in close proximity to them." *Texas Utilities Elec. Co. v. Timmons*, 947 S.W.2d 191, 194 (Tex. 1997)(finding no liability).

44.   A closely analogous unpublished case, *Gonzalez v. Puerto Rico Elecric Power Authority*, 36 F.3d 1089 (1st Cir. 1994) (Table), is instructive.   In *Gonzalez*, a twenty year old man climbed up a guy wire supporting two electric poles at an electrical equipment site maintained by the defendant power company.   1993 WL 525644.   He climbed so high that his head came into contact with the high voltage power line suspended from the pole.   36 F.3d 1089 at *1.   The site was not fenced off, nor was there any sign prohibiting access to the site.   1993 WL 525644 The First Circuit agreed with the district court's reasoning that "defendant could not have foreseen that a twenty year-old would climb 23 to 24 feet on a guy wire to amuse himself... [Defendant] could not reasonably have foreseen the situation...[which] was too fortuitous to require the electric company to guard against it."

> We agree. While anything is possible, there must be a limit in a practical world to what conduct must reasonably be foreseen. Small children could not be expected to climb a wire to that height; a man of twenty ought to know the difference between a slack, supporting guy wire openly touchable at ground level, and an electric power line, and that electricity is dangerous. Hence there was no duty to either one to provide a more complex structure.

36 F.3d 1089 at *1.

45.   *Gonzalez,* 36 F.3d 1089, and *Timmons*, 947 S.W.2d at 194, persuasively reason that a twenty-seven year old man should know that coming close to electric wires and climbing to a height of

thirty feet without any form of fall protection are potentially life-threatening activities.  In *Gonzalez*, there were no warning signs and, although there were warning signs present in *Timmons*, the court specifically noted that the absence of such signs would not have altered the finding of no liability in that case.

46.  The Ninth Circuit in *Henderson*, although acknowledging that foreseeability is the primary factor, makes it clear that a finding of no duty must be based on a complete analysis of <u>all</u> of the *Rowland* factors.  846 F.2d at 1236 (affirming the district court's finding of no duty based on only the foreseeability because no other factor weighed strongly in favor of finding a duty).  The remaining *Rowland* factors are:

> [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved.

*Rowland*, 69 Cal. 2d at 113.

a.  For the obvious reason that Jay Muchhala was killed either by electrocution or by the subsequent fall, the second factor, degree of certainty that the plaintiff suffered injury, weighs in favor of finding a duty.  However, even though the Plaintiff in *Henderson* was injured, the Ninth Circuit did not give this factor controlling.  *See* 846 F.2d at 1236.

b.  The third factor, the closeness of the connection between the defendant's conduct and the injury suffered, raises questions as to whether the presence of a warning sign and/or the removal climbing pegs below seven and a half feet would have

dissuaded the decedent from climbing the pole.

i.   With respect to the presence of absence of a warning sign, Robert Armstrong testified that having knowledge that a pole was an electric pole does not necessarily equate to having a full understanding of the dangers associated with a <u>high voltage</u> electric pole.  He opined that the purpose of high voltage warning signs is to put persons on notice that they are not just dealing with electricity, but with high voltage electricity.  However, Ranger Yu testified that warning signs posted by the NPS are routinely ignored.  For example, NPS maintains warning signs at the top of every major waterfall in the Park, warning of the dangers posed by swimming at the top of the a waterfall.  Yet, people routinely disregard these warnings, with tragic results.  In the final analysis, on this record, which lacks any competent expert evidence regarding the effectiveness of warning signs, it cannot be found with reasonable certainty that a warning sign would have dissuaded Jay Muchhala from climbing the accident pole.

ii.   The evidence as to climbing pegs is inconclusive.  On the one hand, Keith Guy suggests that removal of pegs below seven foot six inches would likely have had little or no effect on the pole's climbability by Jay Muchalla.  He testified that it would have been possible for Jay Muchalla, who was over six feet tall and wearing climbing shoes at the time of the accident, could have climbed the pole even with all pegs below seven foot six inches removed.  However, Kent Summers testified that, without an aid device, it is difficult, although possible, to climb the pole with the pegs at four feet.

**40**

iii.   The evidence relevant to the third factor --
the closeness of the connection between the defendant's conduct
and the injury suffered -- does not weigh strongly in either
direction.

c.   As to the moral blame attached to the defendant's
conduct, there was no evidence suggesting either party acted with
any moral culpability, although Plaintiff's conduct could support
a finding of recklessness.

d.   With respect to the policy of preventing future
harm, it is clear that the regulations followed by the NPS
personnel, including GO 64 and GO 95, embody the general goal of
preventing inadvertent contact with electric wires, high voltage
or otherwise.   However, there is no indication that the
regulations are designed to address the kind of <u>intentional act</u>
<u>by an adult</u> at issue in this case.[4]   This conclusion is supported
by the absence of any cases imposing liability upon the owner or
operator of an electric facility under like circumstances.

e.   The next factor is the extent of the potential
burden to the defendant and consequences to the community of
imposing a duty to exercise care with resulting liability for
breach.   On the one hand, one result of imposing a duty in this

_____

[4]   For example, although not directly on point, the most
relevant language is found within the section of GO 95 regarding
guarding.   GO 95 Rule 52.6(B).   A note to that section provides:

> Note: It is the intent of Rule 51.6-B to require such
> guarding as will prevent easy climbing of these poles
> or structures <u>by young persons who do not realize the</u>
> <u>danger of contact with live conductors supported</u>
> <u>thereon</u>. It is not intended that such guarding will be
> required in sparsely settled districts, mountainous and
> desert areas, and similar locations.

**41**

case might be to encourage the government to conform more closely to industry standards regarding the maintenance and operation of high voltage power lines.  There is indirect evidence that the resulting financial and/or logistical burdens that would be borne by the government would be modest.  The pegs, in fact, have already been removed and additional efforts have been undertaken to ensure that warning signs are maintained on every high voltage pole.  On the other hand, the consequences to the community of imposing a duty here are not insignificant.  The public (either the taxpayer or the fee-paying users of Yosemite National Park) would ultimately bear the cost of an injury caused by the unforeseeable, intentional act of grown man.  These two conflicting considerations counsel against giving this factor considerable weight.

f.   No relevant evidence was submitted on the availability, cost, and prevalence of insurance for the risk involved.  This factor is neutral.

47.   Other than foreseeability, the remaining *Rowland* factors do not weigh strongly in either direction, giving the court little reason to disregard the primacy of the foreseeability factor.

48.   Here, because Jay Muchhala's intentional act of climbing the electric pole was unforeseeable under the totality of the circumstances, the United States owed him no duty of care.

49.   Based on this finding, is not appropriate to reach the question of whether the United States breached any industry standard of care by either failing to post adequate warning signs or by failing to remove pegs below a particular height.

**42**

50.   No evidence established any dangerous condition of public property, as the pole was not defective or in disrepair.

51.   This case arises out of an undeniably tragic loss for Jay Muchhala's family and friends.   However, the case cannot be decided based on sympathy.   The unforseeablity of the event under all the circumstances bars imposing liability upon the United States, as its negligence was not the cause of Jay Muchhala's death.

### CONCLUSION

The United States is not liable in negligence or for dangerous condition of public property, as the Government owed Jay Muchhala no duty of care under the unforeseeable circumstances and there was no evidence to support a dangerous condition of public property claim.


IT IS SO ORDERED.

**Dated:**   **February 5, 2007**                              **/s/ Oliver W. Wanger**
b2e55c                                                                    UNITED STATES DISTRICT JUDGE